

```
 1   LUCAS VALLEY LAW
     MARK K. de LANGIS (SBN 190083)
 2   2110 Elderberry Lane
     San Rafael, California 94903
 3   Telephone: (415) 472-3892
     Facsimile:  (415) 472-3977
 4   mdelangis@lucasvalleylaw.com

 5   Attorney for Plaintiffs
     APL CO. Pte., LTD. and
 6   AMERICAN PRESIDENT LINES, LTD.

 7
```

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| APL CO. Pte., LTD., a corporation, and AMERICAN PRESIDENT LINES, LTD., a corporation,<br><br>  Plaintiffs,<br>v.<br><br>CONTINENTAL SHIPPING LINE (CALIFORNIA), INC., a corporation, and OSCAR E. GALLION, SR., an individual,<br><br>  Defendants. | No. CV 10 0103<br><br>COMPLAINT FOR:<br><br>1. BREACH OF MARITIME CONTRACT;<br>2. OPEN ACCOUNT;<br>3. COMMON COUNT FOR SERVICES PERFORMED |
|---|---|

Plaintiffs APL Co. Pte., Ltd. and American President Lines, Ltd. (collectively "APL") complain against defendants Continental Shipping Line (California), Inc. and Oscar E. Gallion, Sr. (collectively "defendant" or "Gallion") and allege as follows:

**JURISDICTION AND VENUE**

1.  The following claims are admiralty and maritime claims within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure and fall within the admiralty jurisdiction of this Court under 28 U.S.C. section 1333.

2. Venue is proper in the Northern District of California because a substantial part of the contract's terms and conditions were negotiated by and between APL and defendant in the Northern District of California via APL's contract administration division, located in Oakland, California. In addition, the Port of Oakland was designated in the underlying maritime contract as a port at which defendant's cargo was to be loaded on board APL vessels and transported to foreign destinations.

**PARTIES**

3. Plaintiff APL Co. Pte., Ltd. is, and at all relevant times was, a corporation duly organized and existing under the laws of Singapore, residing in Oakland, California, and registered to do business in the State of California.

4. Plaintiff American President Lines, Ltd. is, and at all relevant times was, a corporation duly organized and existing under the laws of the State of Delaware. Plaintiff American President Lines, Ltd., at all times relevant to this lawsuit resided in Oakland, California, however, it has recently moved its business location to Scottsdale, Arizona. American President Lines, Ltd. is registered to do business in California.

5. APL is informed and believes, and on that basis alleges that defendant Continental Shipping Line (California), Inc. is, and at all relevant times was, a corporation duly organized and existing under the laws of the State of California.

6. APL is informed and believes, and on that basis alleges that defendant Oscar E. Gallion, Sr. was at all relevant times to this lawsuit, an individual residing in the State of California. APL is informed and believes that defendant Oscar E. Gallion, Sr. is currently residing in the State of Florida.

7. Although Continental Shipping Line (California), Inc was at all times herein mentioned a corporation existing under and by virtue of the laws of the State of California, APL is informed and believes that at all material times hereto defendant Oscar E. Gallion, Sr. personally supervised, controlled, dominated, and operated Continental Shipping Line

1  (California), Inc. as his own business and alter ego.

2  8. APL is informed and believes that there exists, and at all times since the
3  formation of Continental Shipping Line (California), Inc. there has existed, a unity and identity
4  of interest and ownership between Continental Shipping Line (California), Inc. and Oscar E.
5  Gallion, Sr. such that there is no individuality and separateness between them and that, in fact,
6  Oscar E. Gallion, Sr. is the alter ego of Continental Shipping Line (California), Inc. and
7  Continental Shipping Line (California), Inc. is the alter ego of Oscar E. Gallion, Sr. Oscar E.
8  Gallion, Sr. placed himself as Continental Shipping Line (California), Inc.'s President. From this
9  position, Oscar E. Gallion, Sr. was able to control and dictate Continental Shipping Line
10 (California), Inc.'s operations, and on information and belief, did so.

11 9. Adherence to the fiction of the separate existence of Continental Shipping Line
12 (California), Inc. as an entity distinct from Oscar E. Gallion, Sr. would permit an abuse of the
13 corporate privilege and corporate form, and would sanction the wrongdoing of Oscar E. Gallion,
14 Sr. and Continental Shipping Line (California), Inc. described in more detail below. The
15 asserted separateness between Oscar E. Gallion, Sr. and Continental Shipping Line (California),
16 Inc. should be disregarded. Oscar E. Gallion, Sr. is responsible for Continental Shipping Line
17 (California), Inc.'s debts.

18 10. On information and belief, all the acts and omissions described herein alleged to
19 have been done by any defendant or defendants were performed by, and attributable to, all
20 defendants, each acting as agent, employee, alter ego, and/or under the direction and control of
21 the others, and said acts and omissions were within the scope of said agency, employment, alter
22 ego status, and/or direction and control. Whenever and wherever reference is made in this
23 complaint to any acts of defendants, such allegations shall also be deemed to mean the acts of
24 each other defendant acting individually or jointly and severally.

25
26

## GENERAL ALLEGATIONS

11. At all relevant times, APL was and still is an ocean carrier of goods for hire, *inter alia*, between U.S. and foreign ports.

12. On or about August 2, 2005, APL and Gallion entered into a written service contract, number WB05/0149, whereby APL agreed to transport and convey Gallion's cargo, on behalf of, and at the request of, Gallion. The cargo was contracted to be carried by APL from the United States to various locations in foreign countries.

13. As part of the service contract entered into between Gallion and APL for the transportation and carriage of Gallion's cargo, Gallion expressly agreed to tender his cargo in a quantity sufficient to satisfy a Minimum Volume Commitment ("MVC") as outlined in the service contract between the parties. Specifically, the service contract stated:

> 3. MINIMUM VOLUME COMMITMENT; DEAD FREIGHT; BOOKING
>
> (a) Merchant shall tender not less than the MVC, including specific sub-MVCs, if any, as set forth in an Appendix, during the term hereof. Shipments shall be deemed within the scope of this Contract and shall be counted toward the MVC if made by Merchant's parent, subsidiary, or other affiliated companies or entities under common control, or by an authorized agent in behalf of any such entity, all of which entities must be identified on the signature page or Appendix hereto. Merchant shall remain responsible to Carrier for all obligations of non Merchant parties shipping cargo under this Contract.

14. The MVC, set forth at Appendix F, expressly obligated Gallion to tender a minimum quantity of carriage of 200 freight equivalent units ("FEU") before the contract expiration date of April 30, 2006.

15. The service contract between APL and Gallion contained a liquidated damages provision (known in the trade as dead freight) which provided protection to APL in the event that Gallion failed to meet the MVC, as he had promised. The liquidated damages provision provided that:

> 3. MINIMUM VOLUME COMMITMENT; DEAD FREIGHT; BOOKING
>
> . . . .
>
> (b) If Merchant fails to tender shipments in sufficient quantity to meet Merchant's undertakings as set forth in the foregoing subparagraph 3(a), Merchant shall, within 30 calendar days of receipt of Carrier's invoice, pay deadfreight in the amount of $350 for each FEU by which the MVC (or sub-MVCs, as the case might be) exceeds the volume actually tendered.

16. After the contract expired on April 30, 2006, APL reconciled the contract to determine whether Gallion had fulfilled his MVC and shipped the number of FEUs as promised.

17. APL determined that during the contract's term, Gallion tendered only 44 FEUs of cargo to APL for transport and carriage. As stated above, Gallion had promised to ship 200 FEUs under the contract, but came up short by 156 FEUs (200-44). Accordingly, under the terms of the contract, Gallion became obligated to pay APL a liquidated damages charge ("dead freight") of $54,600. ($350 for each FEU short of the MVC [$350 x 156 = $54,600]).

18. On July 25, 2006, APL issued an invoice to Gallion for $54,600 and presented the invoice to Gallion for payment. According to the service contract's terms, Gallion had 30 days in which to pay the invoice.

19. Gallion failed to pay the invoice within 30 days. And, despite further demands by APL, Gallion has failed to pay the dead freight owed to APL in connection with the above-described service contract and there is due and owing to APL, from Gallion, the amount of $54,600 in dead freight charges, in connection with the above-described service contract.

20. On or about December 5, 2006, APL and Gallion entered into a second written service contract, number LA06/0292, whereby APL agreed to transport and convey Gallion's cargo, on behalf of, and at the request of, Gallion. The cargo was contracted to be carried by APL from the United States to various locations in Latin America and other foreign countries.

21. As part of the second service contract entered into between Gallion and APL, Gallion expressly agreed to tender his cargo in a quantity sufficient to satisfy a Minimum Volume Commitment ("MVC") as outlined in the service contract between the parties. Specifically, as in the first service contract, the service contract also stated:

> 3. MINIMUM VOLUME COMMITMENT; DEAD FREIGHT; BOOKING
>
> (a) Merchant shall tender not less than the MVC, including specific sub-MVCs, if any, as set forth in an Appendix, during the term hereof. Shipments shall be deemed within the scope of this Contract and shall be counted toward the MVC if made by Merchant's parent, subsidiary, or other affiliated companies or entities under common control, or by an authorized agent in behalf of any such entity, all of which entities must be identified on the signature page or Appendix hereto. Merchant shall remain responsible to Carrier for all obligations of non Merchant parties shipping cargo under this Contract.

22. The MVC, set forth at Appendix F, expressly obligated Gallion to tender a minimum quantity of carriage of 200 freight equivalent units ("FEU") before the contract expiration date of December 31, 2007.

23. Like the first service contract, the second service contract between APL and Gallion contained a liquidated damages provision (known in the trade as dead freight) which provided protection to APL in the event that Gallion failed to meet the MVC, as he had promised. The liquidated damages provision provided that:

> 3. MINIMUM VOLUME COMMITMENT; DEAD FREIGHT; BOOKING
>
> . . . .
>
> (b) If Merchant fails to tender shipments in sufficient quantity to meet Merchant's undertakings as set forth in the foregoing subparagraph 3(a), Merchant shall, within 30 calendar days of receipt of Carrier's invoice, pay deadfreight in the amount of $350 for each FEU by which the MVC (or sub-MVCs, as the case might be) exceeds the volume actually tendered.

1  24.  After the second contract expired on December 31, 2007, APL reconciled the
2  contract to determine whether Gallion had fulfilled his MVC and shipped the number of FEUs as
3  promised.

4  25.  APL determined that during the contract's term, Gallion tendered only 35.5 FEUs
5  of cargo to APL for transport and carriage. As stated above, Gallion had promised to ship 200
6  FEUs under the contract, but came up short by 164.5 FEUs (200-35.5). Accordingly, under the
7  terms of the contract, Gallion became obligated to pay APL a liquidated damages charge ("dead
8  freight") of $57,575. ($350 for each FEU short of the MVC [$350 x 164.5 = $57,575]).

9  26.  On February 14, 2008, APL issued an invoice to Gallion for $57,575 and
10 presented the invoice to Gallion for payment. According to the service contract's terms, Gallion
11 had 30 days in which to pay the invoice.

12 27.  Gallion failed to pay the invoice within 30 days. And, despite further demands by
13 APL, Gallion has failed to pay the dead freight owed to APL in connection with the above-
14 described second service contract and there is due and owing to APL, from Gallion, the amount
15 of $57,575 in dead freight charges, in connection with the above-described second service
16 contract.

17 28.  All tolled, Gallion is indebted to APL for dead freight associated with the two
18 service contracts in the amount of $112,175, excluding interest and attorneys' fees.

19                          **FIRST CAUSE OF ACTION**
20                          **(Breach of Maritime Contracts)**

21 29.  APL refers to, and by that reference incorporates as if fully set forth herein, each
22 and every allegation set forth in paragraphs 1 through 28, inclusive, hereinabove.

23 30.  Pursuant to the terms of the two service contracts entered into between the parties,
24 Gallion expressly agreed that if he failed to tender the MVC under each contract, he would pay
25 the dead freight charges due and owing under the above-described service contracts.

26

1  31. APL has performed or tendered performance of all of its obligations under the
2 two service contracts.
3  32. Gallion materially breached the terms of the service contracts entered into
4 between the parties by failing to tender the appropriate amount of FEUs under his MVCs, and by
5 failing pay the dead freight charges within 30 days of receiving APL's invoice, as promised.
6  33. As a direct and proximate cause of Gallion's breach of the two service contracts
7 by failing to tender the appropriate amount of FEUs under his MVCs, and by failing to pay the
8 dead freight charges, APL has suffered damages in the amount of $112,175 (excluding interest
9 and attorneys' fees).
10
11 **SECOND CAUSE OF ACTION**
12 **(Open Account)**
13  34. APL refers to, and by that reference incorporates as if fully set forth herein, each
14 and every allegation set forth in paragraphs 1 through 33, inclusive, hereinabove.
15  35. Gallion owes APL the sum of $54,600 that is due with interest since July 2006
16 and the sum of $57,575 that is due with interest since February 2008, in accordance with the
17 terms of the service contracts more fully described above.
18  36. APL has made demand for payment upon Gallion and Gallion has acknowledged
19 receipt of said demand.
20  37. Gallion has refused to pay and continues to refuse to pay the outstanding sum due
21 and owing.
22 **THIRD CAUSE OF ACTION**
23 **(Common Count - Services Performed)**
24  38. APL refers to, and by that reference incorporates as if fully set forth herein, each
25 and every allegation set forth in paragraphs 1 through 37, inclusive, hereinabove.
26

1  39.  Gallion is indebted to APL for the amount of $112,175, for the services APL performed at Gallion's request.

2  40.  Gallion has failed to pay anything towards the dead freight charge of $112,175; therefore, APL is entitled to recover $112,175, excluding interest and attorneys' fees, for services performed.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs American President Lines, Ltd. and APL Co. Pte., Ltd. pray as follows:

1. The Court enter judgment in APL's favor for $112,175, the full amount of APL's claim;
2. The Court award APL prejudgment interest on all sums as provided by law;
3. The Court award APL its costs of suit;
4. The Court award APL its attorneys' fees as per the terms of the service contract;
5. The Court award APL such other and further relief as the Court may deem proper.

DATED: January 7, 2010

LUCAS VALLEY LAW

By: _____
Mark K. de Langis
Attorneys for Plaintiffs
APL Co. Pte., Ltd. and
AMERICAN PRESIDENT LINES, LTD.

COMPLAINT
9